[L.A. No. 30028. In Bank. Dec. 1. 1972.]

MICHAEL RUBINO, Plaintiff and Respondent, v.
UNEMPLOYMENT INSURANCE APPEALS BOARD.
Defendant and Appellant.

## COUNSEL

Evelle J. Younger, Attorney General, and Edward M. Belasco, Deputy Attorney General, for Defendant and Appellant.

Michael M. Stolzberg for Plaintiff and Respondent.

## OPINION

**McCOMB, J.**—The Unemployment Insurance Appeals Board (hereinafter referred to as "the board") appeals from a judgment in favor of plaintiff (hereinafter referred to as "claimant") after a limited trial de novo following claimant's appeal from an administrative order.

For the period June 1, 1969, through November 1, 1969, claimant received unemployment insurance benefits totaling $1,011 from the Department of Human Resources Development (hereinafter referred to as "the department"). The department issued a retroactive determination that claimant was ineligible for the unemployment insurance benefits under the provisions of section 1253, subdivision (e), of the Unemployment Insurance Code,[1] and alleged an overpayment in the amount of $1,011, on the ground that claimant had not registered for dispatch under a union seek-work plan. Claimant appealed the determination; and, following a hearing, a referee of the board determined that claimant had in fact met the seek-work re-

---

[1]Section 1253 of the Unemployment Insurance Code provides: "An unemployed individual is eligible to receive unemployment compensation benefits with respect to any week only if the director finds that:

"(e) He conducted a search for suitable work in accordance with specific and reasonable instructions of a public employment office."

quirements. Thereafter, the board reversed the determination of the referee. Claimant petitioned the Superior Court of Los Angeles County for a writ directing the department to set aside its decision that he was ineligible for unemployment insurance benefits for the period June 1, 1969, through November 1, 1969, and was liable for an overpayment in the amount of $1,011. As hereinabove indicated, the superior court held in favor of claimant.

*Facts:* Claimant applied for unemployment insurance in June 1969 and was granted benefits on the condition that he comply with a "seek-work plan" promulgated by the department. He was a beer truck driver and a member of Local 203 of the Teamsters' Union. Since all drivers, as well as driver's helpers, had to be hired through the union, the department required only that claimant meet his union's requirements to be dispatched for work.

Claimant's status in the union was that of a temporary man. The union hiring hall always dispatched permanent men for jobs before dispatching temporary men. There was considerable unemployment in the beer industry at the time; and John C. Fahy, the business agent of Local 203, informed claimant that because of the Budweiser strike his chances of being dispatched to a job as a driver were poor. Claimant asked Mr. Fahy how he could pay bills and his union dues if he did not obtain work. Since claimant could not afford to pay the $9-a-month union dues during his period of unemployment, Mr. Fahy suggested that he take a withdrawal card from the union and again become an active member when the employment picture improved.

Mr. Fahy testified that claimant had missed no job opportunities through the union hiring hall because of his having taken out the withdrawal card. He stated that claimant was referred to many salesmen's jobs (which did not require active union membership for the first 31 days) and indicated that if an opening for a driver had occurred, and no permanent men were available, he could have dispatched claimant to work, and claimant could then have surrendered his withdrawal card and resumed a full dues-paying status. At one time in October 1969, while he still had the withdrawal card, claimant was, in fact, dispatched by the union to work as a driver or driver's helper. He worked for only two days and did not turn in his withdrawal card. On November 21, 1969, claimant received another dispatch from the hiring hall, was hired, and went to work. Shortly thereafter, he deposited his withdrawal card and paid his dues for October, November and December 1969.

Claimant testified that he did not inform the department that he was on a withdrawal status, because he had been given to understand that it was immaterial insofar as eligibility for jobs through the union was concerned.

The superior court found, among other things, as follows: "The Court upon weighing the evidence independently finds that petitioner [claimant] made a *bona fide* effort to seek work under his union seek-work plan and was not ineligible for benefits for 17 weeks from June 19, 1969, and November 1, 1969, and petitioner was not liable for $1,011 on overpaid benefits."

Question: *Is there substantial evidence to support the trial court's finding?*

*Yes.* ▉ According to the board's opinion, claimant was required only "to meet his union requirements for dispatch to work." The trial court determined as a matter of fact that claimant had done so, and an examination of the record reveals substantial evidence that claimant was available for dispatch to a job through his union whether or not he was on a withdrawal status. As hereinabove indicated, Mr. Fahy, the union official who advised claimant to take out a withdrawal card, so testified.[2] Claimant also testified that the understanding was that by taking out a withdrawal card

---

[2]Although Mr. Fahy at one time stated that a union member could not be dispatched to a driver's job while he was on withdrawal, he made other statements indicating clearly that it was no obstacle. For instance, he testified: "Q. While [claimant] was on a withdrawal card, could he be referred to a driver's job? A. Yes, if we had work, and I would call him and tell him, 'Mike . . . the Budweiser strike is over . . . . I believe there's going to be work for temporary status men. I suggest you get your card in now because I can send you out to driving.' "

He further testified: "Q. In the event, Mr. Fahy, all of your permanent people were placed and a request came from an employer to place somebody else, in that situation would you have called [claimant] and suggested that he go to his place for employment as a driver? A. I would call [claimant] and tell him, 'I have a job at Plant No. 1'—as a figure of speech. He would have to go to work and deposit his withdrawal card . . . . I might state he might go to work for a day or two before he deposited his withdrawal card. If a man works one day a month he pays dues for the whole month. I might send him on the 10th of the month and he puts his withdrawal card in the 25th of the month."

With respect to claimant's not having lost any opportunity to obtain a job as a driver during the period in which he had the withdrawal card, Mr. Fahy testified: "Q. Mr. Fahy, because of the withdrawal between June and November of 1969, did [claimant] miss out on any referral to a driving position that would have been made to him in the event he was not on withdrawal? A. To my knowledge, when I was on the phones, or I would say no. I did clarify to [claimant] at any time that—once he found work he would have to deposit his withdrawal card. That is normal procedure . . . . Q. So there would be no doubt about his receiving driving jobs, was there any driving job opportunity that [claimant] lost because he was on withdrawal during that period between June 20 and November 21? A. I would have to say no . . . ."

he would in no way be limiting the number of dispatches given to him for prospective work through his union hiring hall.[3]

The testimony of both Mr. Fahy and claimant shows that the latter sought work assiduously during the time of his unemployment.[4]

Under the circumstances, there is substantial evidence to support the superior court's finding.

The judgment is affirmed.

Wright, C. J., Peters, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

---

[3]Thus, claimant testified: "Q. What did you say to Mr. Fahy and what did he say to you with reference to the taking of the withdrawal and the effect that would have on your privilege of dispatch? A. Well, if I remember at the time I was out of work and permanent men were only being hired because there were a lot of them out of work at the time, and [Mr. Fahy] told me it would be best if I took my withdrawal card out and as soon as something came up that I could deposit it and pay my back dues and I'd go right to work as soon as something came up. Q. And in the meantime was anything said as to whether you would stand a greater or poorer chance of securing employment, your withdrawal card having been taken out, than if you continued as a full dues-paid-up member? A. No. What [Mr. Fahy] said, as soon as something broke he would call me or he'd tell me right away and I would put my withdrawal card back in and just pay my dues, but he didn't say anything about there would be—I would stand—how would you say it—the chances were still the same whether I took my withdrawal card out or not."

[4]In this respect, Mr. Fahy testified, in part: "I know on several times I got . . . perturbed at Mike. I said, 'Mike, you're bugging me a little bit. I told you as soon as I have a lead I'll send you out.' In fact we had a couple of clashes. I'd open the office at 8 o'clock. Two occasions, before I had a chance to answer an employer's phone he'd call me and bug me. I have to answer the employer's phone. I can't give him a referral or lead until I get the jobs."

Claimant testified, in part, as follows: "Q. When you would call [the union] in the morning, what would you say to them when you called three or four times a week? A. I'd ask them if there was anything available. Q. Was there any time between June 30 and November 21 of 1969 that you received a referral? A. Yes. Many times for sales jobs. . . . Q. And when you received such referrals what did you do? A. I went out on an interview. [Claimant then named several organizations to which he had been referred and by which he had been interviewed.] There were others, many others, and not only that, but I went out to wine houses." He also later stated: ". . . I went out to different truck lines. I went out on my own. I wasn't referred to the truck lines. You see, I had been a freight driver years and years ago."